RICHMOND & DANVILLE RAILROAD Co. *v.* MERRITT, adm'r.

Though the verdict cannot be supported unless the evidence of a particular witness be true, and though that witness was directly contradicted by two of the employees of the railroad company, and his character attacked by one of these and two others, and though the witness admitted that he had signed a false report of the matter, written by an agent of the company, yet as the jury, notwithstanding all these discrediting circumstances, believed the witness and based their verdict upon his testimony, and the trial judge, by overruling the motion for a new trial, approved the finding, this court not being able to know with full certainty where the truth of the controversy lies, and being disposed in all cases to recognize the right of the jury to determine the credibility of the witnesses, especially when the presiding judge is satisfied, will not reverse the judgment denying a new trial. *McPherson* v. *The State,* 22 *Ga.* 478.     *Judgment affirmed.*
May 22, 1893.

Action for damages. Before Judge VAN EPPS. City court of Atlanta. June term, 1892.

Merritt as administrator of Butler sued for the homicide of Butler. He obtained a verdict for $8,000, and defendant's motion for a new trial was overruled. The grounds of the motion are, that the verdict is contrary to the evidence and without evidence to support it; decidedly and strongly against the weight of evidence; contrary to law and the principles of justice and equity; and excessive in amount, showing undue bias and prejudice on the part of jurors.

Upon the question as to the amount of the verdict, the evidence showed: At the time he was killed Butler was yardmaster for defendant in Anniston, Alabama. He appeared to be, and, according to the testimony of his wife, was in good physical condition. He was strong, and had no chronic trouble, disease or illness. He was not addicted to the use of ardent spirits, was industrious and economical. He would have been thirty-five years old at his next birthday. He contributed to the support of his wife (they had no children) about $100 a month; she supposed their expenses were about that much. Before he obtained the position in Anniston with defendant, he had practiced law and had also been engaged in railroading. As a railroad man he got $90 and $100 a month, and was getting that when killed. He was economical and saving; had saved some money and attended a law school for a year. He practiced law for a time. He saved up enough money from his employments to put several hundred dollars in law books. He was employed in a law office for a while and paid $100, and sometimes got outside business to do, etc. Plaintiff put in evidence the Carlisle tables.

As to the manner of Butler's death, one Swope testified for plaintiff: There had been a wreck on the railroad, and the cars were brought in by the road engine to the yard at Anniston. The road engine was in front of the cars, and a switch or yard engine was on the

track behind them.   When Butler was killed two good cars next to the engine and the road engine were to be put into the side-track, and two broken cars which had been in the wreck were to be put in "the bloomer," a side-track, out of the way.   It was Butler's duty to attend to that business.   Swope was one of the switchmen in the yard crew.   When killed Butler was cutting off the broken down cars, which were in bad condition, the drawheads being out of one and of no account in the other, and the cars being chained together.   Butler was about two car-lengths from the road engine, and eight or ten from the yard engine.   The road engine was coupled to the cars, and the yard engine was at the other end coupled to another car loose from the train. It was Swope's duty to obey the orders of Butler.   When Butler went in between the cars referred to, he told Swope to go down and tell the engineer not to move the engine until Butler or Swope gave him a signal; this was not over five minutes before the accident.   Swope communicated this order to Wilson, the engineer of the yard engine, telling him that Butler and Swope were going up there to unchain some cars.   The engineer said, all right, and got down on the ground.   Swope thought Butler had control of Wilson's operation of the yard engine.   After delivering these orders to Wilson, Swope went on up and told the road engine to slack ahead a little bit, so as to get the slack out of the cars, and then to stand still.   The road engine slacked ahead. Butler stepped in between the cars, and Wilson hit them at the lower end with the yard engine.   Swope did not know who gave the signal, but they coupled the car attached to the yard engine to this train, and the cars caught Butler, holding him straight up, and witness told the men on the road engine to slack the engine, that the yardmaster was caught.   When they started off afterwards Butler's feet dropped, and Wilson down at the

other end shoved the cars and shoved the wheel over his body. When the wheel ran over him he was lying on the rail. Butler did not give any signal to the yard engineer to couple on to and push those cars, and Swope did not give any instructions to the yard engineer to move. The yard was full of cars at the time, and it was almost impossible to get a train through the yard. Wilson's manner of coming back was pretty reckless; he hit the cars in a hard way; he came back faster than he should have come. From Swope's association with Wilson and his opportunities of observing Wilson's manner of handling his engine, he would regard Wilson as a reckless engineer. As to whether it was not the business of the yardmaster to couple and uncouple cars, that he had men employed to do it, Swope did not know that it was limited; the yardmaster coupled them when he could not get hands, and he employed them when he could get them; they do not generally have men enough to work; did not have them then; Butler could not get them.

Wilson, the engineer, testified: They told me Butler said come right down to that broken down car and hitch to it and push it. Swope did not come to me and tell me that the yardmaster ordered me not to move the train until he gave me a signal. There was no conversation between Swope and me before the accident, and I had not seen Swope. After the accident Swope came running down there and said, "You have killed Mr. Butler." I was not aware of the fact, until then, that I had run over a man. On account of a curve in the track and the cars, I could not see the point where Butler was. I moved the train down there because I got a signal from my brakeman, a colored fellow named Bradford, whose present whereabouts I do not know; have not seen him since that occurred. Bradford worked for the road, I think, two or three days after the accident, and was not

discharged about that accident; he quit.  He gave me
the signal to back up, and I moved about four or five
feet.  Butler was on the right-hand side, on the fireman's
side of the train.  I moved on the signal from Bradford,
who was on top of the cars about three car-lengths from
Butler.  No engine was attached to the other end of the
train.  I could not see the other engine, and do not know
what they were doing down at the other end.  When I
moved, the other engine "blowed" me down to stop, but
where that signal was given I do not know.  I moved
about four or five feet, just catching up the slack; there
was no jar or jolt when the car coupled; it was all done
very easy.  If the fellow in front had not blown me
down, I would have kept on pushing.  Besides the sig-
nal then, there were signals given on the fireman's side
by the conductor of the train.  The last signal that was
given me was that given by the brakeman.  Butler
ordered me to push those cars up to the "bloomer," and
I was there doing that work under Butler's orders.  The
last I had seen of Butler, he was going into the office.
I do not suppose the fireman could have seen the signal
when given by Bradford.  Just before I moved in re-
sponse to that signal, the bell was rung by the fireman.
It was my duty and it was the rule, before moving that
engine, to give a signal, and I gave two blows.  Accord-
ing to what the yard men say, it was against the rules
for the yardmaster to couple or uncouple cars, though
I do not know what the rules are as to the yardmaster.
It is not the custom for the yardmaster to go between
the cars, and as I saw yardmasters going and coming in
discharging their duties they did not do it as a general
rule, but I cannot say whether they did go between them
frequently.  Sometimes they do it themselves.  Bradford
was one of the yard crew and it was my duty to obey
the signals that came from the yard crew, and especially
in connection with moving cars that had been brought

off the road in a wrecked condition to be put on a side-track or other purpose.—Gleason, the fireman on Wilson's engine, testified: First knew that Butler was killed when Swope came down to the engine and told it. I had not seen him before, and Swope had not been there and ordered the engineer not to move for Butler. I never heard any such order given. I rang the bell when the engine moved, and the engine moved four or five feet back, I judge. I heard no signal of any kind from any other engine, and do not know why the engineer stopped. Wilson received the signal to move, but I do not know who gave the signal; think it was a negro, but did not see it when it was given. I know that a brakeman named Bradford was working there that day. Think there was a whistle blown by another engine, but could not say for certain. When Wilson started back he blew off brakes. I got no signals at all from anybody. If one of the yard crew had been back on that train two or three cars and Butler had gone in between those cars, I suppose the men could have seen Butler; suppose Bradford could. I did not see Butler go between them. Sometimes the yardmaster would go between cars, and couple and uncouple them to assist the crew.—One witness testified, that the switch-engine came up in about eight or ten feet of the rear end of the train and stopped, and they had not given room sufficient to pull out east, and they blew them back, and the engine came back and struck the cars very lightly; that Swope came running back and hollowed to the engineer that they had killed Mr. Butler, and that caused them to stop; and that there were no other signals given for them to stop, that witness remembered.—McDonald testified: I and a white man (whom I did not know, but supposed was the man in charge of the switch-engine) gave the signal to the engineer to move at the time when Butler was killed. I was conductor of the train

by which Butler was killed; had no communication with Butler.  I and the other man were on the ground about a car-length from the caboose of the train.  I do not know who was the last man that gave the signal on which the engineer moved.  I did not start the signalling, but the man did who was there with me; the man signalled the engineer to come ahead as I did.  I wanted to clear the crossing to keep a policeman from making a case against me.  The train moved twice.  The switch-engine did not couple to the caboose but went to push it; it stopped, and when it went up against the caboose, shoved the cars forward and went against it the second time, moving it altogether, I suppose, not over four or five feet.  At the time of the accident I was between two and three car-lengths from Wilson, was within about a car-length when I first saw him; there was no violence or any shock when the engine came against the cars, that I know of; nothing unusual, just a common coupling.  The man who was near me made the proposition that the switch-engine would push the cars over and clear the crossing to keep a case from being made against me.  It was the duty of any of the men engaged with the engine to signal the engine.  The yard men were not signalling my signals at all; not under my control.  This man was giving signals and I was signalling, but I do not know whether Wilson obeyed my signal or not.  Wilson obeyed the signal of the man who signalled just before I did.  I do not know Bradford; there was a negro up on top of the car, but I do not know whether any signal was given from the top of the car.  When I gave my signal I was looking at the engineer, not at the negro.—There was testimony for defendant, tending to impeach Swope, and to show that Wilson was a competent engineer; and for plaintiff, tending to show that Bradford was not at work in the yard, and that on the day of the accident Wilson stated

that he did not know who signalled him to move the train. This was denied by Wilson. From the rules of the road as to the yardmaster's duties, it appeared that yardmasters had charge of the yards where trains were made up, the movement of trains therein, and the force employed; that they must attend to the making up and proper arrangement of freight-trains and see that they left on time; that they were responsible for the proper distribution of cars and the prompt movement of all cars within the limits of their yards; that they must see that their yards were kept in good order, etc. It did not further appear from the rules that yardmasters were allowed to go or prohibited from going between cars, or to couple and uncouple them. The evidence indicates that while it was not a part of the usual duties of yardmasters to actually assist in coupling and uncoupling cars, it was not an uncommon thing for them to do so, especially where yards were crowded and their assistance in this way seemed to be needed; and that the yard at Anniston was blocked, full of cars.

JACKSON, LEFTWICH & BLACK, for plaintiff in error.

KING & CARTHEL and KING & ANDERSON, *contra.*